**TRAVIS COUNTY CHILD WELFARE UNIT, Appellant,**

v.

**Robert Harold VANCE, Appellee.**

**No. 12710.**

Court of Civil Appeals of Texas, Austin.

May 3, 1978.

Jacqueline Strashun, James D. Baskin, III, Travis County Juvenile Court, Austin, for appellant.

Noel R. Cain, Bigham, Cain & Mahler, Belton, for appellee.

SHANNON, Justice.

This appeal is from a judgment which granted a biological father's petition for voluntary legitimation of his child. Tex. Family Code Ann. § 13.21, et seq. (Supp. 1978). We will reverse that judgment.

Appellant, Travis County Child Welfare Unit, filed suit in district court of Travis County to terminate the parent-child relationship between Cassius William Disbrow

and his mother, Sheron Elaine Skiles. Appellant also sought termination of the parent-child relationship between Cassius and his "legal" father, Cassius Lea Disbrow, and his biological father, appellee Robert Harold Vance. Disbrow, although served, made no appearance. Mrs. Skiles filed a waiver of citation and an affidavit of relinquishment of parental rights. Vance filed an answer and a cross-action in the form of a petition for voluntary legitimation of the child. By his petition Vance sought an order judicially establishing Cassius as his legitimate child and appointing Vance as the child's managing conservator.

Upon trial to the court judgment was entered terminating the parent-child relationship between the boy, his mother, and Disbrow. The judgment, however, granted Vance's petition for voluntary legitimation and also appointed Vance managing conservator of the child.

Texas Family Code Ann. § 13.21 affords the biological father the opportunity to make his child legitimate and to become a "parent." The court is required to enter a decree designating the child as the legitimate child of its father and the father as the parent if the court finds that:

(1) the parent-child relationship between the child and its original mother has not been terminated by a court decree;

(2) a statement of paternity has been executed by the biological father; and

(3) the mother or the managing conservator has consented to the decree. § 13.21(b).

If the entry of the decree is in the "best interest of the child," the court may consent to the legitimation of the child even though the mother or the managing conservator do not consent. § 13.21(c).

In the case at bar the mother-child relationship had not been terminated and the statement of paternity had been executed, but the mother had not consented to the decree of legitimation. The district court, nevertheless, granted the petition for legitimation and conservatorship upon the basis that the entry of that order was in the "best interest of the child." § 13.21(c).

Appellant's point of error is that the district court erred by finding upon factually insufficient evidence that the "best interest" of the child would be served by granting the petition for voluntary legitimation. In reviewing a factual sufficiency point of error the court considers all of the evidence to determine whether the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

Cassius was born in May of 1974 in South Dakota. At the time of Cassius' birth his mother was living with, but not married to, Cassius Lea Disbrow. Disbrow did not father the child, but he permitted his name to be placed on the child's birth certificate because ". . . he wanted the baby to have a name."

Vance is the child's biological father. Mrs. Skiles met Vance and moved in with him in Belton, Texas. About two months later Cassius was conceived. Mrs. Skiles testified by deposition that she left Vance about three weeks later because Vance became violent when drunk and he at times thrashed her during his drinking bouts. Mrs. Skiles testified that she saw Vance some time afterward and told him that she was pregnant by him. Vance did not offer to help her.

Mrs. Skiles testified that during her stay in South Dakota, she kept in communication with Vance's sister, Darlene Gangloff, who lived in the trailer next to Vance. One of Mrs. Skiles' children was living during this time with Mrs. Gangloff.

After Cassius' birth his mother returned with him to Texas. She then married and separated from Danny Skiles. Mrs. Skiles and Cassius afterward lived in Austin. Mrs. Skiles requested in April of 1976 that Cassius be placed in adoption through the welfare agency. Appellant called Vance in November of 1976 concerning the relinquishment of his rights to Cassius, and for the first time since Cassius' birth, Vance indicated an interest in the child.

Vance is thirty-eight and unmarried. He lives in a small trailer in Belton. He works as a "groundsman" in building electrical highlines. He commands a substantial wage, but his earnings depend upon favorable weather and construction demand.

By a previous marriage Vance has three teen-age daughters. Although Vance is required by the divorce decree to pay one-hundred dollars each month in child support, he has made no child support payments during the past two or three years.

Other than gifts of toys and clothes worth thirty to forty dollars, Vance never contributed anything for the support of Cassius. Vance testified that after he learned that Cassius was with the welfare agency he offered to make payments. The social worker, according to Vance, told him that his support was not necessary since ". . . it was a Federal Government thing. . . ." The social worker told him that she would call or write him. if support were needed. Vance testified that because the agency had not called him, he thought that his support was not necessary.

With respect to his plans for Cassius, Vance testified that he would employ a teen-age baby-sitter to stay with Cassius during the day in his sister's trailer house. His sister would not be at home because she works. He planned also for Cassius to sleep at his sister's trailer house. Upon investigation by a Bell County social worker it was learned that the prospective baby-sitter was also a prospective bride. The baby-sitter intends to keep Cassius at her parents' trailer or perhaps at her future home, wherever that may be. Vance's alternate plan was to place Cassius in a day care center.

From November of 1976 to trial time in May of 1977, Vance visited Cassius seven times. At one time there was a seven-week gap between visits.

Vance claimed that he had overcome his drinking problem, although he admitted that he was serving a probated sentence received for conviction for driving while intoxicated in the autumn of 1976.

Appellant called three social workers who had observed and worked with Cassius in his placement in foster care. Their testimony was that Cassius' best interest would be served by a two-parent home which provided continuity, stability, security, and particularly a strong mother figure. It was their view that Vance or his projected plans did not meet Cassius' needs in those respects.

Upon request the court filed findings of fact and conclusions of law. The court viewed the facts to be that Vance loves the child, is concerned for the child's welfare, and desires to discharge his duties as father. The court found that Vance is able and will "amply" support the child. The court found that Vance had established a permanent residence in Bell County and ". . . can and will establish a good and stable home for the child." Further, the court observed that Vance has made medical and child care plans for Cassius. The court found that Vance's sister will provide ". . . a strong mother figure for the child," and that the sister and her family will provide ". . . a close family unit for the child . . . to identify with." With respect to Vance's past failure to support the child, the court determined that Mrs. Skiles was a transient whose whereabouts were unknown to Vance and that *Mrs. Skiles* made no attempts to seek support from Vance. Further, Vance was not ordered by a court to make support payments. The court found that Vance, upon learning of the child's need for support, offered support.

The court concluded that Vance's failure to support the child was excused, and that termination of Vance's "parental rights" was not in the best interests of the child. The court concluded further that legitimation of the child and creation of the parent-child relationship between Vance and Cassius was ". . . in the best interest of the child." It was also in the best interest of the child to appoint Vance as managing conservator.

■ It is the child's best interest, and not the interest of the biological father, which must be served by legitimation. § 13.21(c).

Vance's love for the child was, at best, late in season. When he was told that he was to become a father, he did nothing to assist or aid the child's mother. From his sister Vance knew the whereabouts of Mrs. Skiles and that she had given birth to the child. Still Vance made no offer to support the child. Vance did not even make an effort to see the child until he learned that the agency was initiating procedures to place the child in adoption. Although he was financially able to support the child, Vance excused himself from contributing because he was told one time that assistance was not necessary. Vance's past disregard for the child's welfare is convincing evidence that he has but faint devotion for the child.

The testimony was that Cassius needed continuity, stability, security, and particularly a strong mother figure. Vance is not married and the only "mother figure" which he can offer is his married sister. Even so, his sister could function as mother only part-time because she works. During the day Cassius would be cared for by a teen-age baby-sitter or by attendants in a day care center. In addition, Vance is required on occasion to be gone from home for days because of his work. Those absences, although unavoidable, would not contribute to Cassius' need for continuity and stability.

Vance has suffered from a drinking problem. He becomes violent and abusive when he drinks. It could not be in the best interests of the child to be placed with a person of those habits. Although Vance testified that he has overcome his problem with drink, the fact that Vance was convicted recently of driving while intoxicated argues against his professed turnabout in behavior.

Vance has failed to support his legitimate children even though under court order. His reason for nonpayment was that he receives no tax benefit from making the support payments. His reason for nonpayment is, of course, no excuse. He appears heedless of his duty, apart from law, to support his children as best he can. Vance's promise of future support of Cassi-

us may be measured by his past indifference to the welfare of Cassius and his daughters. *De Llano v. Moran*, 160 Tex. 490, 333 S.W.2d 359 (1960); *D____ F____ v. State*, 525 S.W.2d 933 (Tex.Civ. App.1975, no writ).

We have considered all of the evidence. We have concluded that the court's finding that it was in the best interest of the child to grant Vance's petition for voluntary legitimation was so contrary to the great weight and preponderance of the evidence as to be clearly wrong. The judgment is reversed and the cause is remanded to district court for new trial.